FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA    2018 APR 10 PM 2: 46
Orlando Division

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. GEORGE W. CHISHOLM, M.D.,<br>     ANTHONY T. PERRIN, D.O.,<br>     DAVID TEITELBAUM, M.D., and<br><br>STATE OF FLORIDA<br>ex rel. GEORGE W. CHISHOLM, M.D.,<br>     ANTHONY T. PERRIN, D.O.,<br>     DAVID TEITELBAUM, M.D.,<br><br>    Plaintiffs,<br><br>v.<br><br>CENTRAL FLORIDA FAMILY<br>HEALTH CENTER, INC., dba<br>TRUE HEALTH,<br><br>    Defendant | QUI TAM ACTION:<br><br>FILED IN CAMERA<br>AND UNDER SEAL<br><br><br><br>CASE NO. 6:18-CV-556-ORL-41-KRS |

REDACTED
**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Preliminary Statement**

This Complaint is based upon a scheme conducted by the Defendant, CENTRAL

FLORIDA FAMILY HEALTH CENTER, INC., dba TRUE HEALTH ("True Health"), to

defraud the United States of America and the State of Florida by submitting false and fraudulent

claims to the Medicaid program.

The Relators, George W. Chisholm, M.D., Anthony T. Perrin, D.O., and David

Teitelbaum, M.D., through their undersigned counsel, acting on their own behalf and in the name

of the United States and the State of Florida, brings this civil action under the *qui tam* provisions

of the federal and state False Claims Acts; and hereby allege the following:

## I. BACKGROUND

### Jurisdiction and Venue

1.   This Court has original jurisdiction over this Complaint pursuant to the federal False Claims Act, 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345; and supplemental jurisdiction over their state claims pursuant to 28 U.S.C. § 1367(a).

2.   Many of the alleged acts arose in the Middle District of Florida; and the Defendant transacted business in the Middle District of Florida.  For these reasons venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

### The Relators

3.   Plaintiff George W. Chisholm, M.D. ("Dr. Chisholm") is a citizen of the United States and a resident of Orlando, Florida; he is bringing this suit in the name of, and on behalf of, the United States of America and of the State of Florida.

4.   Plaintiff Anthony T. Perrin, D.O. ("Dr. Perrin") is a citizen of the United States and a resident of Lake Mary, Florida; he is bringing this suit in the name of, and on behalf of, the United States of America and of the State of Florida.

5.   Plaintiff David Teitelbaum, M.D. ("Dr. Teitelbaum") is a citizen of the United States and a resident of Oviedo, Florida; he is bringing this suit in the name of, and on behalf of, the United States of America and of the State of Florida.

6.   Dr. Chisholm, Dr. Perrin, and Dr. Teitelbaum (collectively, the "Plaintiffs" or the "Relators") were each employed by True Health as a doctor of obstetrics, gynecology, and prenatal services from April 2015 until November 2015.

7. Each Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based, derived through his employment with the Defendant, the Central Florida Family Health Center, Inc., dba True Health (hereinafter, "True Health"), and each has provided the information upon which each bases his allegations in this Complaint to the United States and to the State of Florida before having filed this Complaint.

8. None of the allegations set forth in this Complaint is based upon a public disclosure of allegations or transactions (i) in a criminal, civil, or administrative hearing; (ii) in a congressional, legislative, or administrative hearing; (iii) in any proceeding involving a Florida chief internal auditor, inspector general, auditor general, (iv) in a United States General Accounting Office, report, hearing, audit, or investigation; or (v) in the news media.

9. The Relators are each an original source, within the meaning of 31 U.S.C. § 3730(e)(4)(B) and Fla. Stat. § 68.087(3), of the information on which the allegations set forth in this Complaint are based, such information having been derived through the employment of the Relators with True Health, as obstetrician-gynecologist ("OB/GYN") physicians; and each has voluntarily provided such information to the government of the United States and to the State of Florida prior to the filing of this Complaint.

## The Defendant

10. Defendant True Health is a Florida corporation organized for the purpose of providing primary medical and dental care to the low-income, underinsured, uninsured, Medicaid and Medicare populations of Seminole and Orange Counties in Florida; and has multiple clinics in Central Florida.

11. Among the services that True Health provides to these populations are obstetrics and gynecology ("OB/GYN") services; and the facilities where it provides such services are the following:

    **(a)**   **Sanford**, at 4930 East Lake Mary Blvd., in Sanford, Florida; and

    **(b)**   **Hoffner,** at 5449 S. Semoran Blvd., Suite No.14, in Orlando, Florida.

12. At all times pertinent to this Complaint, the officers and managers of True Health who were involved in the operation of the company and whose functions pertained to the Sanford and Hoffner facilities included the following:

    **(a)**   Anthony Diaz: Director of Information Technology;

    **(b)**   Jim Merill: Chief Financial Officer;

    **(c)**   Deanna Montella: Director of Nursing;

    **(d)**   Dr. Karenna Senors: Chief Medical Officer; and

    **(e)**   Latrice Stewart: the Chief Executive Officer.

13. At all times pertinent to this Complaint, the employees of True Health who were involved in the provision of OB/GYN services included the following:

    **(a)**   Jessica Dean: Midwife;

    **(b)**   Keira Scheerer: Ultrasound Technician;

    **(c)**   Tamika Sharp: Midwife;

    **(d)**   Myra White: Midwife; and

    **(e)**   Jessica Young: Midwife.

### The Medicaid Program

14. At all times pertinent to this Complaint, the Social Security Act (Title 42, United States Code, Section 1395 *et seq*.) was in full effect, and establishes the Medicaid Program,

which provides that each state must implement a plan for medical assistance; and provides compensation to health care providers who provide medical services and items to recipients who are indigent.

15. Under the Medicaid program, funding for the medical assistance programs of the states is partially provided by the United States and partially by the states.

16. The United States Department of Health and Human Services ("HHS") is a department of the United States of America, the responsibilities of which at all times pertinent to this Complaint included the supervision of the Medicaid Program.

17. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS, the responsibilities of which at all times pertinent to this Complaint included the supervision of the Medicaid and the partial funding of that program.

18. The Agency for Health Care Administration ("AHCA") is an agency of the State of Florida, the responsibilities of which at all times pertinent to this Complaint included the administration of Medicaid services in Florida and the funding of these services.

**Ultrasound Services Under Florida Medicaid**

19. At all times pertinent to this Complaint, Florida's Medicaid rules provided that "Obstetrical ultrasounds require direct supervision by the treating provider."

20. At all times pertinent to this Complaint, the Florida Medicaid Definitions Policy § 2.130 defined a "treating provider" as:

> [An] Individual provider who personally renders Florida Medicaid covered services, or assumes responsibility for rendering Florida Medicaid covered services, through personal supervision, on behalf of a Florida Medicaid group provider.

21. At all times pertinent to this Complaint, the Florida Administrative Code, 59G-1.010 (276), defined "direct supervision" as **face-to-face supervision**, occurring during the time the services are being furnished:

> (276) "Supervision" means directing and being fully legally responsible for the actions of another person. "Direct supervision" means face-to-face supervision during the time the services are being furnished. "Personal supervision" means that the services are furnished while the supervising practitioner is in the building and that the supervising practitioner signs and dates the medical records (chart) within 24 hours of the provision of the service.

22. At all times pertinent to this Complaint, Florida's Medicaid rules (Coverage and Limitations Handbook at 2-66) .also provided that (bold added):

> Complex pregnancy conditions may require a **detailed fetal anatomic examination.** Florida Medicaid will reimburse one ultrasound (procedure code 76811) to **provider specialties 47 (radiology) and 65 (maternal/fetal)** [maternal-fetal medicine specialist, i.e., a medical doctor with this specialty]. This procedure is limited to one procedure per pregnancy and must include a detailed anatomic evaluation of fetal brain and ventricles, face, heart with outflow tracts, chest anatomy, abdominal organ specific anatomy, and limbs. As clinically indicated, a detailed evaluation of the umbilical cord, placenta and other fetal anatomy must be documented and maintained in the medical record.

### Ultrasound Services at True Health

23. At all times pertinent to this Complaint, ultrasounds were performed at True Health *without* the direct supervision of qualified providers, and by providers who were *not* the treating provider for the patients.

24. As part of its ultrasound procedures, True Health prepared a report that included diagnostic results of the ultrasound; each report contained a unique Medical Record Number, or "MRN," used by True Health as a systematic documentation of a patient's medical history and care.

25. In order for Medicaid to approve and to pay for these ultrasound procedures, it was required by, and material to AHCA, that the ultrasound reports be read and signed by a radiologist or a maternal-fetal medicine specialist.

26. During a period that included June 26 to August 31, 2015, True Health provided detailed anatomical ultrasounds to a number of patients, both pregnant and not pregnant, *without* having the reports for these ultrasounds read or signed by either a radiologist or a maternal-fetal medicine specialist (hereinafter, the "Unread Reports").

27. Among the Unread Reports were those for procedures performed on pregnant patients who underwent detailed anatomical fetal ultrasound procedures on the following days (the "Detailed Fetal Ultrasound Procedures"), and having the following MRN numbers (the "Unread Fetal Ultrasound Reports"):

**TABLE I**
**Detailed Fetal Ultrasound Procedures with Unread Reports**

| Date of Service | MRN | | Date of Service | MRN |
|---|---|---|---|---|
| 15 | | | 5 | |
| 15 | | | 5 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 17 | | | 15 | |
| 5 | | | 15 | |
| 5 | | | 15 | |
| 17 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| Aug 15 | | | | |

7

28. Instead of being signed by a radiologist or a maternal-fetal medicine specialist, the aforesaid Unread Reports were signed by midwives or by ultrasound technicians.

29. On or about September 3, 2015, Deanna Montella, True Health's Director of Nursing, sent an email (Exhibit A) to Dr. Perrin, asking him to electronically "re-sign" the Unread Reports (bold added):

> I was talking to Keira today and she was saying you are having her reprint all ultrasounds she has done. **If the document is scanned in the system, we can have you electronically sign as a second signature.**

30. Dr. Perrin rejected this suggestion, doing so by email dated September 4, 2015 (Exhibit A):

> In my opinion, All ultrasound reports with Jessica Dean's Signature (as well as any other midwife) has to be removed from the system, and corrected with the proper signatures, the[n] re-entered in the EMR [electronic medical records system] system.
>
> I will not countersign her signature in the system.
>
> I would like to be very clear about what had been happening, and I have spoken to Jessica Dean, CNM at length about the legal jeopardy that she has created for herself, the OB providers and the organization as a whole. Keira has done a phenomenal job in providing timely Maternal and GYN ultrasound scans and reports. These reports have to be signed before they are entered in the EMR. There have been many occasions, when either Dr. Teitelbaum, or myself have not been available, at the time, to sign off on these reports so that Keira can continue her work or complete scanning of these reports into the pt's [patient's] record.
>
> Possibly, in an effort to help, Jessica has signed her name as the "Reading Physician" on at least 50, and may be as many as 100 reports. I don't know the correct number. The first time I saw her signature on a pt's report was during a chart check for a high risk patient, and whose prenatal record had to be faxed out to another organization, and the ultrasound was last encounter the pt had, and this ultrasound was signed off by Jessica as the "physician" who read the scan verified the findings, and subsequently signed as the "Reading Physician".
>
> This singular act is wrong, and each report that she had signed is a separate act of fraud. All these acts are fraudulent on several levels:

8

1. First, Jessica is not a physician. You have to be a licensed physician to sign a report as a physician. Alleging otherwise is fraud, and against the law.

2. Jessica is totally unqualified to read any ultrasounds. She neither has the training, nor the Board Certification to read ultrasounds. - that's also fraud.

3. The fact that we are billing for these ultrasound with her name on the reports, as the reading physician is fraud, and we will be legally liable. If audited, and we are found to have been paid on even one claim with her name on the scan, we will be investigated, fined and likely lose some if not all our insurance networks.

4. Furthermore she is not even credentialed on any, if not all of the insurance plans of the Pts for which she has signed off on their ultrasound reports.

5. If I, or any of the Obstetricians countersigns Jessica signature, we are not only condoning her actions, but we will be committing fraud as well, since there would be no way to dispute the fact that these reports were first "Read" by her and signed by her, and then we have just rubber stamped a fraudulent act. This is a serious matter, and I will not put my license at risk for this, or any midwife, who exercises poor judgement, and refuses to seek the advice of any of the supervising Obstetricians.

Dr. Senors is aware of this issue.

31. By email dated September 4, 2015 (Exhibit B), Deanna Montella told Dr. Perrin:

I spoke to Keira late yesterday after you and I spoke Dr[.] Perrin and we will be printing them for signature. We will then re-scan in and delete the previous scanned document.

32. True Health then printed out the Unread Reports, *without* the signatures of the midwives and ultrasound technicians that had originally been affixed to them; and among these reports are those identified in Table I, above, with redacted copies contained in Exhibit C, attached to and incorporated in this Complaint.

33. True Health's purpose for printing out the Unread Reports was to have Dr. Chisholm, Dr. Perrin, D.O., and Dr. Teitelbaum, sign these reports, despite the fact that none of

these reports had been produced or initially read or signed by them or while under the direct supervision of any qualified medical doctor who was treating the subject of the report.

34. Dr. Chisholm, Dr. Perrin, and Dr. Teitelbaum all refused to sign the printouts of these Unread Reports.

35. On or about September 15, 2015, because Dr. Chisholm, Dr. Perrin, and Dr. Teitelbaum refused to sign the printouts of these Unread Report from which the original signatures of the midwife or ultrasound technician had been deleted, True Health terminated their employment.

**COUNT ONE**
**False Claims: No Direct Supervision**
**31 U.S.C. § 3729(a)(1)(A) (amended May 20, 2009)**

36. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35 of this Complaint, and further allege:

37. At all times pertinent to this Complaint, the Social Security Act limited the meaning of the term "physician" for the purposes of the Medicaid program to a doctor of medicine or osteopathy. Social Security Act §§1905(a)(5)(A) and 1861(r)(1); Florida Administrative Code, 59G-1.010 (209).

38. At all times pertinent to this Complaint, the applicable Current Procedural Terminology Code ("CPT Code") for a detailed anatomical ultrasound procedure performed on a pregnant patient was 76811; and was defined as: "Pregnant uterus, real time with image documentation, fetal and maternal evaluation plus detailed fetal anatomic examination, transabdominal approach; single or first gestations."

39. The Consensus Report of the Detailed Fetal Anatomic Ultrasound Examination, February 1, 2014 (http://onlinelibrary.wiley.com/doi/10.7863/ultra.33.2.189/full) explains the nature and purpose of a detailed fetal anatomic examination as follows:

The detailed fetal anatomic examination (CPT 76811) is not intended to be the routine ultrasound examination performed for all pregnancies. Rather, it is an indication-driven examination performed for a known or suspected fetal anatomic abnormality, known fetal growth disorder, genetic abnormality, or increased risk for a fetal anatomic or genetic abnormality. Thus, the performance of the detailed fetal anatomic examination should be rare outside referral practices with special expertise in the identification and diagnosis of fetal anomalies. Only 1 such medically indicated study per pregnancy per practice is appropriate. If 1 or more required structures are not adequately demonstrated during the 76811 examination, the patient may be brought back for a focused assessment (76816). A second detailed fetal anatomic survey should not be performed unless there are extenuating circumstances.

40. At all times pertinent to this Complaint, to be reimbursable under the Florida Medicaid Program, the procedure associated with CPT Code 76811 had to be performed by a treating physician or by another professional with the *face-to-face supervision* of a *treating* physician. Moreover, CPT Code 76811 was explicitly limited to physicians trained in the specialties of radiology (Code 47) or Maternal Fetal Medicine (Code 65). *See* Florida Medicaid Practitioner Services Coverage and Limitations Handbook at 2-68 (Agency for Health Care Administration, Dec. 2012). This was because the "detailed fetal anatomic examination" involved requires special qualifications and training, especially in the potentially very serious "indication-driven" situation in which there is a "known or suspected fetal anatomic abnormality," or increased risk therefor, prompting the examination and survey in the first instance.

41. At all times pertinent to this Complaint, it was material to AHCA when determining whether to make payment on a claim for payment under the under the Florida Medicaid Program for CPT Code 76811 whether such procedure had or had not been performed by a treating

physician or by another professional with the face-to-face supervision of a treating physician: AHCA would neither pay nor approve for payment a claim for a procedure identified by CPT Code 76811 if it knew that such procedure had or had not been performed by a treating physician or by another professional with the face-to-face supervision of a treating physician.

42.  Use of CPT Code 76811 in a claim or other demand for money to the Florida Medicaid Program for detailed anatomical ultrasound procedure included the implied certification that all the providers of such procedure had complied with all Florida Rules and Regulations, including that the procedure had been performed by a treating physician or had been performed by another professional under the face-to-face supervision of a treating physician.

43.  During the period beginning on an unknown date in and prior to April 2015, and continuing until an unknown date in and after November 2015, all detailed anatomical ultrasound procedures performed on pregnant patients at and by True Health were performed by ultrasound technicians or midwives; and thus these procedures were performed by persons *other than* treating physicians—they were performed by medically and legally unqualified persons without face-to-face supervision by treating physicians.

44.  During the period beginning on an unknown date in and prior to April 2015 and continuing until an unknown date in and after November 2015, True Health presented claims to AHCA for payment for detailed anatomical ultrasound procedures performed on pregnant patients, identified by CPT Code 76811.  By presenting these signed claims for payment, True Health falsely and fraudulently certified by implication for each claim that the associated procedure was validly performed by treating physicians or with face-to-face supervision by treating physicians.

45. Each such implied certification, and each such claim, was made by True Health in full knowledge that it was false and fraudulent: True Health knew that each such procedure was in fact performed by a medically and legally unqualified person other than the treating physician and *without* the required face-to-face supervision by the treating physician.

46. Each presentation of the aforesaid claims by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(A) (amended 2009).

47. As a result of these false and fraudulent claims, the United States suffered actual damages.

## COUNT TWO
### False Claims: No Direct Supervision
### Fla. Stat. § 68.082(2)(a)

48. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35, and paragraphs 37 through 45 of this Complaint, and further allege:

49. Each presentation of the aforesaid claims by the Defendant was in violation of Fla. Stat. § 68.082(2)(a).

50. As a result of these false and fraudulent claims, the State of Florida suffered actual damages.

## COUNT THREE
### False Claims: No Office Visit
### 31 U.S.C. § 3729(a)(1)(A) (amended May 20, 2009)

51. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35 of this Complaint, and further allege:

52. Among the Unread Reports were for those for procedures performed on non-pregnant patients who underwent detailed ultrasound procedures on the following days (the "Detailed Non-Fetal Procedures"), and having the following MRN numbers (Exhibit D, the "Unread Non-Fetal Reports"):

**TABLE II**
**Detailed Non-Fetal Ultrasound Procedures with Unread Reports**

| Date of Service | MRN | | Date of Service | MRN |
|---|---|---|---|---|
| 5 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| 15 | | | 15 | |
| -15 | | | | |

53. In or about mid-September 2015, Latrice Stewart, as CEO of True Health, directed the Relators to sign records for those patients who had undergone the Unread Fetal and Non-Fetal Procedures identified in Tables I and II above, falsely identifying these procedures as non-ultrasound office visits rather than correctly as detailed anatomical ultrasound procedures.

54. During the period beginning on or about September 15, 2015 and continuing until an unknown date in or about October 15, 2015, True Health presented claims to AHCA for payment, for office visits for those patients and for those dates identified in Tables I and II, above.

55. Each such claim was made in full knowledge that it was false and fraudulent by True Health, as it then knew that such claims were in fact not office visits but instead were detailed anatomical ultrasounds, some being fetal ultrasounds and some being non-fetal ultrasounds, each as specified in the above tables.

56. Each presentation of the aforesaid claims by the Defendant was in violation of 31 U.S.C. § 3729(a)(1)(A) (amended 2009).

57. As a result of these false and fraudulent claims, the United States suffered actual damages.

**COUNT FOUR**
**False Claims: No Office Visit**
**Fla. Stat. § 68.082(2)(a)**

58. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35, and paragraphs 52 through 57 of this Complaint, and further allege:

59. Each presentation of the aforesaid claims by the Defendant was in violation of Fla. Stat. § 68.082(2)(a).

60. As a result of these false and fraudulent claims, the State of Florida suffered actual damages.

**COUNT FIVE**
**False Claims: Reverse Claims**
**31 U.S.C. § 3729(a)(1)(G) (amended May 20, 2009)**

61. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35, paragraphs 37 through 47, paragraphs 49 through 57, paragraphs 52 through 57, and paragraphs 59 through 60 of this Complaint, and further allege:

62. At all times pertinent to this Complaint, the Affordable Care Act of 2010 required a provider that received an overpayment from the Medicare or Medicaid programs to report and return the overpayment by the later of (1) 60 days after the date on which the overpayment was identified and (2) the due date of a corresponding cost report (if any). There is no *de minimis* exception to this requirement.

63. At all times pertinent to this Complaint, True Health, as Central Florida Family Health Center, Inc., made and presented cost reports to CMS to reconcile its Medicare receipts and its allowable payments from the Medicare program, doing so using Form CMS-222-92.

64. Among other items of information required by Form CMS-222-92 were costs attributable to non-Medicare patients, including Medicaid recipients; and payments received through non-Medicare sources, including the Medicaid Program.

65. The aforesaid information was material to CMS so as to correctly determine how much money CMS should allow and should pay to True Health from the Medicare Trust Fund for the provision of health care services to Medicare beneficiaries.

66. True Health made and presented its cost reports to CMS on a yearly basis: each cost report was prepared for a fiscal year beginning January 1st and ending December 31; and each cost report was presented to CMS on or before April 30th of the following year.

67. Beginning in 2014 and continuing until the present, True Health falsified its cost reports by intentionally failing to identify those payments it had received from AHCA to which it was not entitled and for which it was legally obligated to reimburse the Medicaid program, to-wit:

(a) the moneys received for billing the Medicaid program for the above-described false and fraudulent claims presented for Detailed Fetal Ultrasound Procedures that it had provided without the required direct supervision; and

(b) the moneys received for billing the Medicaid program the above-described false and fraudulent claims for office visits, which were in fact Detailed Fetal and Non-Fetal Ultrasound Procedures.

68.  During the period 2014 and continuing until the date of this Complaint, True Health knowingly made and used, and knowingly caused to be made and used, false records and false statements, these being the aforesaid cost reports and the statements made in those costs reports concerning Medicaid funds received from AHCA, which false reports and statements were material to the obligation of True Health to pay and transmit money to the United States, this being the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, all in violation of 31 U.S.C. § 3729(a)(1)(G) (amended 2009) and 42 U.S.C. 1320a-7k(d).

69.  During the period 2014 and continuing until the date of this Complaint, True Health knowingly concealed and knowingly and improperly avoided its obligation to pay money to the United States, this being the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, by knowingly omitting from the aforesaid cost reports the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, all in violation of 31 U.S.C. § 3729(a)(1)(G) (amended 2009) and 42 U.S.C. 1320a-7k(d).

70.  As a result of these false cost reports and True Health's concealment and omissions, the United States suffered actual damages.

### COUNT SIX
### False Claims: Reverse False Claims
### Fla. Stat. § 68.082(2)(g)

71.  The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs 1 through 35, paragraphs 37 through 47, paragraphs 49 through 50, paragraphs 52 through 57, paragraphs 59 through 60, and paragraphs 62 through 70 of this Complaint, and further allege:

72. During the period 2014 and continuing until the date of this Complaint, True Health knowingly made and used, and knowingly caused to be made and used, false records and false statements, these being the aforesaid cost reports and the statements made in those costs reports concerning Medicaid funds received from AHCA, which false reports and statements were material to the obligation of True Health to pay and transmit money to the State of Florida, this being the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, all in violation of Fla. Stat. § 68.082(2)(g).

73. During the period 2014 and continuing until the date of this Complaint, True Health knowingly concealed and knowingly and improperly avoided its obligation to pay money to the State of Florida, this being the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, by knowingly omitting from the aforesaid cost reports the overpayments for the payments received from AHCA for the aforesaid false and fraudulent claims, all in violation of Fla. Stat. § 68.082(2)(g).

74. As a result of these false cost reports and True Health's concealment and omissions, the State of Florida suffered actual damages.

### Request for Relief

The Plaintiffs, Dr. Chisholm, Dr. Perrin, and Dr. Teitelbaum, acting on behalf of and in the name of the United States and the State of Florida, hereby demand and seek that judgment be entered in favor of the United States and the State of Florida, and against the Defendant Central Florida Family Health Center, Inc., dba True Health, for each count in which the Defendant is named, as follows:

### Under the Federal False Claims Act

1. For treble damages incurred by the United States;

2. For civil penalties of twenty-one thousand nine hundred sixteen dollars ($21,916) for each false claim submitted to the United States;

3. For civil penalties of twenty-one thousand nine hundred sixteen dollars ($21,916) for each false record and statement made or used to get false claims paid or approved, in the form of the above described cost reports.

4. For interest on: the above treble damages, from the date on which the damages were incurred; and on the above civil penalties, from the date on which this Complaint is served upon the Defendant;

5. For all costs and expenses of this civil action; and

6. For such other and further relief as the Court deems just and equitable.

### Under the Florida False Claims Act

7. For treble damages incurred by the State of Florida;

8. For civil penalties of eleven thousand dollars ($11,000) for each false claim submitted to the State of Florida;

9. For civil penalties of eleven thousand dollars ($11,000) for each false record and statement made or used to get false claims paid or approved, in the form of the above-described cost reports.

10. For interest on: the above treble damages, from the date on which the damages were incurred; and on the above civil penalties, from the date on which this Complaint is served upon the Defendant;

11. For all costs and expenses of this civil action; and

12. For such other and further relief as the Court deems just and equitable.

## For Themselves

In addition, the Plaintiffs, each acting on his own behalf, demand and seek that an award be made in their favor as follows:

1. For thirty percent (30%) of the proceeds collected by the United States;

2. For thirty percent (30%) of the proceeds collected by the State of Florida;

3. For an amount for reasonable expenses necessarily incurred by each Plaintiff in the prosecution of this action;

4. For all reasonable expenses incurred by each Plaintiff relation with these proceedings, plus all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d) and (h); and Fla. Stat. § 448.104; and

5. For such other and further relief to which each Plaintiff may show himself justly entitled.


## Jury Demand

The Plaintiffs hereby demand that this matter be tried before a jury.


By: _Tobe Lev_

Tobe Lev, Esq. (Fla. Bar No. 226475)
EGAN, LEV, LINDSTROM & SIWICA, P.A.
P.O. Box 2231
Orlando, FL 32802
Telephone: (407) 422-1400
Facsimile: (407) 522-3658
Email: tlev@eganlev.com

Andrew Grosso, Esq. (Fla. Bar No. 0998583)
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 300
Washington, D.C. 20007
Telephone: (202) 298-6500
Facsimile: (202) 298-5599
Email: Agrosso@acm.org

Stephen J. Bagge, Esq. (Fla. Bar No. 97788)
STEPHEN J. BAGGE, P.A.
3902 Henderson Blvd. STE 208-30
Tampa, FL 33629
Telephone: (813) 250-0511
Facsimile: (813) 250-0511
Email: sbagge@baggelaw.com

Dated: April 10, 2018

*Attorneys for Plaintiffs Dr. Chisholm, Dr. Perrin, and Dr. Teitelbaum*

21